# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
### Miami Division

## CASE NO. 09-22593-CIV-GRAHAM/TORRES

_____

JEANNETTE HAUSLER *as Successor Personal
Representative of the Estate of* ROBERT OTIS
FULLER ("BOBBY FULLER"), *Deceased*, on
behalf of THOMAS CASKEY as Personal
Representative of the Estate of LYNITA
FULLER CASKEY, surviving daughter of
ROBERT OTIS FULLER, The ESTATE OF
ROBERT OTIS FULLER, FREDERICK
FULLER, FRANCES FULLER, GRACE
LUTES, JEANETTE HAUSLER, AND
IRENE MOSS,

       Plaintiffs,

vs.

THE REPUBLIC OF CUBA, et al.,

       Defendants.

_____

## IMPLEADER DEFENDANTS EMPRESA CUBANA del TABACO AND EMPRESA CUBANA EXPORTADORA de ALIMENTOS y PRODUCTOS VARIOS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

IRA J. KURZBAN (Florida Bar No. 225517)
GEOFFREY A. HOFFMAN (Florida Bar No. 59972)
KURZBAN KURZBAN WEINGER & TETZELI, P.A.
2650 S.W. 17th Avenue, 2d Floor
Miami, Florida 33133
Telephone: (305) 444-0060
Facsimile: (305) 444-3503
Email ira@kkwtlaw.com

MICHAEL KRINSKY
DAVID B. GOLDSTEIN
RABINOWITZ, BOUDIN,
  STANDARD, KRINSKY &
  LIEBERMAN, P.C.
111 Broadway, Room 1102
New York, NY 10006
Telephone: (212) 254-1111
Facsimile: (212) 674-4614
Email mkrinsky@rbskl.com

*Attorneys for Impleader Defendants Empresa Cubana del Tabaco, d/b/a Cubatabaco
and Empresa Cubana Exportadora de Alimentos y Productos Varios, d/b/a Cubaexport*

Impleader Defendants Empresa Cubana del Tabaco, d/b/a Cubatabaco ("Cubatabaco") and Empresa Cubana Exportadora de Alimentos y Productos Varios, d/b/a Cubaexport ("Cubaexport") respectfully submit this memorandum of law in support of their motion pursuant to Fed. R. Civ. P. Rules 12(b)(1) - (3), (6) to dismiss this Impleader Action.

## STATEMENT OF THE CASE

Impleader Defendants are Cuban companies.  Pursuant to the Cuban Assets Control Regulations' General License for trademark registrations, 31 C.F.R. § 515.527, the United States Patent and Trademark Office ("USPTO") has issued nine registrations for cigar trademarks to Cubatabaco and one registration for a rum trademark to Cubaexport.  Additionally, Cubatabaco has three applications for registrations pending at the USPTO.  *See* Impleader Motion, Ex. E (Dkt. 1-2, at 56-62)  Pursuant to the President's authority under the Trading With the Enemy Act ("TWEA"), 50 U.S.C. § 5(b), the United States authorizes the registration of Cuban trademarks in order to "provide reciprocal protection for the intellectual property of Cuba and the United States."  Director, U.S. Dept. Treasury, Office of Foreign Assets Control ("OFAC"), letter ruling (Aug. 19, 1996).  *See* Appendix of Materials ("App.") 1.

By the instant Impleader Action, Plaintiff Jeannette Hausler ("Plaintiff") seeks to execute upon, through their sale at public auction, Cubatabaco and Cubaexport's USPTO registrations and applications in satisfaction of a state court, default judgment against the Republic of Cuba. Cubatabaco and Cubaexport were not named as defendants in that action, were not served with process or any pleadings in that action, and did not participate in that action.

Plaintiff, joined by other plaintiffs, commenced the state court action on May 25, 2002 in the Circuit Court of the 11th Judicial Circuit In and For Miami-Dade County, Florida. They sought damages for the alleged "extrajudicial killing" and "torture" of their relative, Robert Otis

Fuller, in Cuba in October 1960.  Basing its jurisdiction on one of the Foreign Sovereign

Immunity Act ("FSIA")'s exceptions to immunity from jurisdiction, former 28 U.S.C.

§ 1605(a)(7),[1] the state court, after default, entered an Amended Final Judgment ("AFJ") (Dkt. 1-

2, at 2-22) on June 19, 2007, awarding $100 million in compensatory damages and $300 million

in punitive damages against the Republic of Cuba.[2]

On July 28, 2009, the state court issued an "Order for Proceedings Supplementary to

Execution and Impleader," impleading Cubatabaco and Cubaexport as "Impleader Defendants"

"into this action."   On September 1, 2009, Cubatabaco and Cubaexport filed a timely Notice of

Removal pursuant to 28 U.S.C. §§ 1441 and 1446, 28 U.S.C. §§ 1330, 1331, 1332 and 1338, and

15 U.S.C. § 1121 (Dkt. 1).  This Court set October 2, 2009 as the time for Cubatabaco and

Cubaexport to file a Rule 12(b) motion or other responsive pleading (Dkt. 7).

The state court lacked personal and subject matter jurisdiction to issue the underlying

judgment against the Republic of Cuba, which is therefore void and unenforceable.  Under FSIA

§ 1604, the Republic of Cuba was immune from jurisdiction unless the U.S. Secretary of State

designated Cuba as a "state sponsor of terrorism" "*as a result*" of the acts of "extrajudicial

killing" or "torture" sued upon.  FSIA § 1605(a)(7) (emphasis added).  The state court literally

cited nothing to support its one-sentence jurisdictional finding that the Secretary of State

designated Cuba in 1982 "at least in part by reason" of the alleged extrajudicial killing and

---

[1]  Congress added 28 U.S.C. § 1605(a)(7) to the FSIA in 1996. *See* Antiterrorism and Effect
Death Penalty Act of 1996, Pub. L. No. 104-132, § 221, 110 Stat. 1241-43 (1996). In January
2008, Congress repealed section 1605(a)(7).  *See* National Defense Authorization Act for Fiscal
Year 2008, Pub. L. No. 110-181, § 1083(b)(1)(A)(iii), 122 Stat. 341 (2008).  In the same
legislation, Congress enacted a new provision, codified at 28 U.S.C. § 1605A, which is not
applicable here.

[2]  The judgment was entered against the other named defendants as well, but Plaintiff only
demands execution on the award against the Republic of Cuba.

torture of Robert Otis Fuller in 1960, twenty-two years earlier. *See* AFJ, at 5. The state court's finding is contrary to the State Department's stated reasons for the Secretary of State's designation of Cuba; there is nothing to support the finding; and it is false.

Jurisdiction and venue do not lie for this Impleader Action in Florida, where Impleader Defendants have no contacts or property. *See* Adargelio Garrido de La Grana and Francisco Cecilio Santiago Pichardo Declarations (Sept. 22, 2009).

Plaintiff purports to state a claim against Cubatabaco and Cubaexport exclusively pursuant to the Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, § 201(a), (b), (d), 116 Stat. 2337 (2002) ("TRIA"). TRIA provides a limited statutory exception: (a) to the prohibition of the Cuban Assets Control Regulations ("CACR") against execution of a judgment against property in which Cuba or a Cuban national has an interest, unless OFAC has specifically licensed the demanded execution, 31 C.F.R. §§ 515.201(b), 515.310; (b) to FSIA § 1609's immunity of the property of a foreign state and of its agencies and instrumentalities from execution, and (c) to the federal rule of law, recognized in *First National City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*"), that the property of agencies and instrumentalities of a foreign state cannot be executed upon in satisfaction of a judgment against the foreign state. TRIA is inapplicable for several reasons.

Under settled principles of trademark law, the Court cannot seize and execute upon the registrations and applications (hereafter sometimes collectively "registrations") because, *inter alia*, there would be no continuity with Cubatabaco and Cubaexport's businesses and the goodwill appurtenant thereto.

In addition to opposing execution upon registrations issued to it, and its pending applications, Cubatabaco opposes the demanded execution upon Reg. No. 756,558 on the same

grounds. [3]

For these and additional reasons, the Impleader Action should be dismissed.[4]

## I.      THE COURT CANNOT EXECUTE UPON THE JUDGMENT BECAUSE THE RENDERING COURT LACKED JURISDICTION

### A.      The Rendering Court Lacked Personal and Subject Matter Jurisdiction Because the Republic of Cuba Was Immune Under the Foreign Sovereign Immunities Act

#### 1.      Cuba Was Immune Because the Secretary of State Did Not Designate It As a State Sponsor of Terrorism "As a Result of" the Act Sued Upon

FSIA § 1604 provides that a foreign state "shall be immune from the jurisdiction of the courts ... except as provided in sections 1605 to 1607."  There is thus no subject matter jurisdiction unless one of those exceptions applies.  *See Republic of Iraq v. Beaty*, ___ U.S. ___, 129 S. Ct. 2183, 2186 (2009); *Butler v. Sukhoi, Co.*, ___ F 3d. ___ , 2009 WL 2514088 (11th Cir. Aug. 19, 2009).  Personal jurisdiction over a foreign state or its "agency or instrumentality" under 28 U.S.C. § 1330(b) is dependent on one of the FSIA §§ 1605-1607 exceptions being applicable.  *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 485 n.5 (1983).

FSIA § 1605(a)(7), the only possibly relevant exception and the only source of jurisdiction cited by the state court, established an exception from FSIA § 1604 immunity for

---

[3] Reg. No. 756,558 is for REPUBLICA DE CUBA CUBAN GOVERNMENT'S WARRANTY FOR CIGARS EXPORTED FROM HAVANA SELLO DE GARANTIA NACIONAL DE PROCEDENCIA PARA TABACOS.

Plaintiff alleges the Impleader Defendants have an interest in all of the trademarks listed in Exhibit E.  Impleader Motion, ¶ 15.

[4] The only property that is or could be at issue here are the USPTO registrations and applications, despite the Impleader Motion referring imprecisely to "trademarks" and appurtenant goodwill.  Since the CACR, 31 C.F.R. § 515.201(b), prohibits sale of Cuban cigars or rum, Cubatabaco and Cubaexport cannot acquire trademark rights by use in commerce.  They can only obtain trademark rights by registration, and their rights are limited to those derived from those registrations.  CACR  §§ 515.201(b), 515.310, 515.527; *see Empresa Cubana del Tabaco v. Culbro Corp.*, 399 F.3d. 462, 472-477 (2d. Cir. 2005); United States *Amicus Curiae* Brief (Nov. 12, 2004), at 6-9, in *Empresa Cubana* (App. 2).

acts of "extrajudicial killing" or "torture" but, expressly, *only* when the foreign state had been designated by the Secretary of State pursuant to specified federal laws as a "state sponsor of terrorism" "at the time the act" sued upon occurred, "unless later so designated *as a result of such act*." (emphasis added).

The Secretary of State designated Cuba *in 1982* "as a country that has repeatedly provided support for international terrorism," pursuant to the Export Administration Act of 1979, § 6(j); 50 U.S.C. App. § 2405(j).  *See* 47 Fed. Reg. 16623-01 (April 19, 1982).  The acts sued upon occurred in 1960.  Jurisdiction therefore depended on whether the Secretary of State had designated Cuba in 1982 "as a result" of the Fuller incident twenty-two years earlier.

The state court cited nothing to support its one-sentence jurisdictional finding that the Secretary of State designated Cuba as a state sponsor of terrorism "at least in part by reason" of the alleged extrajudicial killing and torture of Robert Otis Fuller in 1960.  AFJ, at 5.[5]  Yet, this Circuit has ruled that "the plaintiff must overcome the presumption that the foreign state is immune from suit by producing evidence" to meet his burden that one of the exceptions to immunity applies, *Sukhoi*, 2009 WL 2514088, *3, and that "conclusory allegations or legal conclusion masquerading as factual conclusions will not suffice . . . ."  *Id.*, at *4.   Under *Sukhoi*, the state court lacked jurisdiction.

Further, the state court's jurisdictional finding is directly contrary to the State Department's stated reasons for the Secretary of State's designation. Within days of the Secretary of State's designation on March 1, 1982, the State Department informed the Senate that:

> I believe you are all aware of the reasons behind designating Cuba as a repeated

---

[5] Plaintiff's Second Amended Complaint did not even allege that the Secretary of State had designated the Republic of Cuba as a result of the act sued upon.

supporter of acts of international terrorism.  In the case of Cuba, we evaluated carefully the evidence of Cuban support for revolutionary violence and groups which use terrorism as a policy instrument, Cuban leaders have publicly asserted a right and a duty to provide such support.  One example is the support Cuba has given to the M-19, a Columbian group which has repeatedly engaged in kidnappings, bombings, hostage-taking, and aircraft hijacking.  This support caused Colombia to server diplomatic relations with Cuba in 1981. Our conclusion was that Cuba clearly belongs in the category of states which have repeatedly provided support for acts of international terrorism.[6]

The State Department published its testimony in the *Department of State Bulletin* (82 *Dept. of State Bulletin*, No. 2063, at 55-56 (June 1982)) (App. 3), which is the "official record of U.S. foreign policy," *Roeder v. Islamic Republic of Iran*, 195 F. Supp. 2d 140, 160 (D.D.C. 2002) (quoting United States' memorandum), *aff'd*, 333 F.3d 228 (D.C. Cir. 2003).  The State Department also published its testimony in *Cumulative Digest of United States Practice in International Law 1981 - 1988*, which is prepared by its Office of the Legal Adviser, *Id.*, Vol. III, at 3022 (1995) (App. 4).

In its "Chronology of U.S.-Cuban Relations, 1958-1998", the State Department stated for 1982, "U.S. adds Cuba to list of countries supporting international terrorism for its support of the M-19 movement in Columbia."  (App. 5).

The State Department's explanation was echoed in its *Patterns of International Terrorism Report:  1982*, at 16 (App. 6):

> In its efforts to promote armed revolution by leftist forces in Latin America, Cuba supports organizations and groups that use terrorism to undermine existing regimes.  In cooperation with the Soviets, the Cubans have facilitated the movement of people and weapons into Central and South America and have directly provided funding, training, arms, safe haven and advice to a wide variety

---

[6]  Prepared Statement of Deputy Assistant Secretary of State Ernest Johnston Jr., *The Change in Department of Commerce Regulations on Exports to Iraq, South Africa, Syria, and South Yemen*, *Hearing Before the Subcommittee on Near Eastern and South Asian Affairs, Committee on Foreign Affairs*, *U.S. Senate*, 97th Cong. 13 (Mar. 18, 1982).

of guerilla groups and individual terrorists.[7]

To determine whether FSIA § 1605(a)(7) exception to immunity applies because the foreign state was designated "as a result" of the act sued upon, the courts must "review the public record that existed at the time designation was made." *Roeder*, 195 F. Supp. 2d at 161 (public record failed to show that the 1984 designation of Iran as a state sponsor of terrorism was a result of the hostage taking of 1979-1981), *aff'd*, 333 F.3d at 235 (Iran had not been designated a state sponsor of terrorism "when the act occurred or as a result of the act").  The Executive's position, presented in *Roeder*, is that a judicial determination of the Secretary of State's reasons for designating a state must be based on the official, contemporaneous State Department record, and not the speculative views of non-State Department personnel.  United States Reply Mem. (Jan. 7, 2003), at 12-15 ("official and contemporaneous documentation of the basis for Iran's designation"), *available at* http://www.state.gov/documents/organization/16571.pdf.  Here, as shown, the public record authoritatively made by the State Department is clear and dispositive.

The courts have found 1605(a)(7)'s jurisdictional "as a result" requirement not satisfied even where the act sued upon had a much closer connection to the designation in both time and rationale than here.  *See Roeder*, 195 F. Supp. 2d at 160-61 (1984 designation of Iran as a state sponsor of terrorism not "a result of" the 1979-1981 hostage taking at U.S. embassy); *Kalasho v. Iraqi Gov't*, 2001 WL 34056852 (W.D. Mich. May 29, 2001) (despite contemporaneous State Department reports that acts of terrorism were perpetrated by Iraqi government since 1968, plaintiff had not established that the Secretary of State's designation of Iraq in 1990 was "a

---

[7] Additional State Department documents from 1981 to 1982 similarly expressed concern that Cuba was supporting revolutionary violence and terrorism in other countries of Latin America. *See* U.S. Department of State, Special Report No. 90, *Cuba's Renewed Support for Violence in Latin America*, Dec. 14, 1981, 82 *Dept. of State Bulletin* No. 2059, at 68, 71 (Feb. 1982); Testimony of Assistant Secretary of State Thomas O. Enders, *The Role of Cuba in International Terrorism and Subversion, Before the Subcommittee on Security and Terrorism Committee of the Judiciary*, 97th Cong. 142-48 (Mar. 12, 1982).

result" of decedent's kidnapping by Iraq in 1969 or death in 1974).

There is simply no precedent for finding FSIA § 1605(a)(7) jurisdiction when, as here, the act sued upon occurred more than two decades before the Secretary of State's designation, and, to boot, the State Department's stated reasons for the designation (Cuba's support of armed insurgencies in other countries) does not encompass the act or the type of act sued upon.  In contrast, the court in *Prevatt v. Islamic Republic of Iran*, 421 F. Supp. 2d 152, 158 (D.D.C. 2006) found FSIA § 1605(a)(7) jurisdiction for a suit based on the attack on Marine barracks in Lebanon where the Secretary of State made his designation "shortly thereafter."  *See also Valore v. Islamic Republic of Iran*, 478 F. Supp. 2d 101, 106-07 (D.D.C. 2007) (same, citing *Prevatt*); *Dammarell v. Islamic Republic of Iran*, 281 F. Supp. 2d 105, 113 (D.D.C. 2003) (Secretary's 1984 designation "was in response to Iran's role in sponsoring a number of terrorist acts in Lebanon, including the April 18, 1983, Embassy bombing.").[8]

FSIA § 1605(a)(7) was "consistently resisted by the executive branch" and reflects a "delicate legislative compromise."  *In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71, 89 (2d Cir. 2008) (internal quotation omitted); *see also Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 89 (D.C. Cir. 2002).  As is evident from its text, FSIA § 1605(a)(7) was "narrowly crafted" so that the "legislation should have no effect on the ability of the

---

[8] Courts normally consider "as a result of" statutory language to have the plain meaning of a proximate, direct, nonremote, but for causal relationship.   That relationship has not been established here, nor could it be.  *See, e.g.*, *Brown v. Gardner*, 513 U.S. 115, 119 (1994) ("as a result of" language imposes a requirement of "causal connection . . . limited to proximate causation so as to narrow the class of compensable cases"); *Black Hills Aviation, Inc. v. U.S.*, 34 F.3d 968, 975 (10th Cir. 1994) ("The use of the plain language— 'as a result of' — is logically interpreted to mean 'caused by' . . . [as opposed] to 'connected with,' … [which] would be giving the phrase a broader interpretation than its common usage."); *Williams v. U.S.*, 503 U.S. 193, 203 (1992) ("as a result of" language in sentencing guidelines to require a "but for" test).

President and officers of the Executive to control foreign policy."[9]  It would severely disturb that "delicate legislative compromise," and affect the "the ability of the President … to control foreign policy" for the courts to deny sovereign immunity on the basis of the Secretary's designation, when the acts sued upon occurred more than two decades prior to the designation, the State Department publicly stated the reasons for the Secretary's designation and those stated reasons have nothing to do with the act sued upon.

### 2.        The Jurisdictional Limitations Period Had Expired

The state court also lacked jurisdiction because the claims were brought outside the FSIA's ten year jurisdictional limitations period for actions brought pursuant to § 1605(a)(7).  28 U.S.C. § 1605(f).[10]  Plaintiff brought suit in 2002, six years after enactment of § 1605(a)(7) on April 24, 1996.  The state court mistakenly held that Plaintiff had the full ten year limitations period *after* § 1605(a)(7)'s enactment to bring her action; instead, Plaintiff was required to bring suit as soon as reasonably possible after enactment.

The Eleventh Circuit has held that, when, as here, the defendant is not responsible for the

---

[9]  Prepared Statement of Senator Arlen Spector, *Hearings on S825 Before the Subcomm. on Courts and Admin. Practice, of the Comm. on the Judiciary, U.S. Senate*, 103rd Cong. 25 (1994).

[10]  28 U.S.C. § 1605(f) (since repealed) provided:  "No action shall be maintained under [§ 1605(a)(7)] unless the action is commenced not later than 10 years after the date on which the cause of action arose.  All principles of equitable tolling, including the period during which the foreign state was immune from suit, shall apply in calculating this limitation period."

Section 1605(a)(7) is "a jurisdiction-conferring provision that does not otherwise provide a cause of action against either a foreign state or its agents," *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1032 (D.C. Cir. 2004), and that "jurisdictional provision upon which the plaintiffs rely [§ 1605(a)(7)] contains a limitations period," *i.e.*, 1605(f), *Simon v. Republic of Iraq*, 529 F.3d 1187, 1194 (D.C. Cir. 2008), *rev'd on other grounds, sub nom., Republic of Iraq v. Beaty*, 129 S. Ct. 2183 (2009).  The law of this Circuit is that limitations periods in the closely analogous context of the United States' immunity are jurisdictional. *See Simon v. United States*, 244 F.2d 703, 705 (5th Cir. 1957) ("time requirement prescribed by a statute granting the right to sue the United States or a state is construed as a condition or qualification of the right; such a provision is in other words jurisdictional rather than a mere statute of limitations.").

plaintiff's inability to bring suit (Plaintiff was blocked by U.S. law, not defendants), "'a plaintiff who invokes equitable tolling … must bring suit *within a reasonable time*'" after it became possible to bring the action – here, after § 1605(a)(7)'s enactment.  *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1155-56 (11th Cir. 2005) (emphasis added, quoting *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 453 (7th Cir. 1990)).  *Cabello* distinguished a situation in which *the defendant* impeded the plaintiff's ability to file a timely action, in which case "the clock stops … and begins again when the impediment to bringing suit is removed." *Id.* at 1156.

At least two district courts in the District of Columbia have held that a plaintiff is entitled to additional time after § 1605(a)(7)'s enactment only upon demonstrating that it was reasonably necessary to commence suit, and only to that additional time.  *See Vine v. Republic of Iraq*, 459 F. Supp. 2d 10, 22, 25 (D.D.C. 2006); *Buonocore III v. Great Socialist People's Libyan Arab Jamahiriya*, 2007 WL 2007509, at * 4 (D.D.C. July 9, 2007).

The D.C. Circuit rejected *Vine* in *Simon v. Republic of Iraq*, *supra*, n.10.  The court recognized that application of equitable tolling principles adopted in *Cada* – which, critically, are the law of this Circuit under *Cabella* – compel a plaintiff to bring suit within a reasonable time after § 1605(a)(7)'s enactment and to justify any-post enactment delay.  *Id*. at 1195.  However, the court avoided that result by an untenable reading of the statute's text, in which the court concluded that the statute overrode that equitable tolling doctrine, and allowed ten years from the lifting of immunity in 1996 to bring suit.  *Simon*, 529 F.3d at 1195-96.

A plain reading of § 1605(f), however, requires that the "period during which the foreign state was immune" be subsumed in, and not independent from, the application of the "principles of equitable tolling," as the statute provides that "principles of equitable tolling, *including* the period during which the foreign state was immune from suit, shall apply in calculating this

limitation period." (Emphasis added).  Instead of adopting this plain reading, *Simon* unmoors the subordinate "including" clause from the sentence in which it is located, so that it is no longer treated as part of applying "principles of equitable tolling," and applies it directly to the preceding sentence in which the 10-year limitation period is set out.  Thus, the court explicitly converts "including" to "add," and *adds* the immunity period to the 10-year limitations period, without any regard for the "principles of equitable tolling":  "We 'include,' *i.e*., *add*, 'the period during which [Iraq] was immune from suit'" to the 10-year limitations period.  *Id*. at 1195 (emphasis added); *see id.* at 1196.  *Simon* thereby excises the "principles of equitable tolling" from the statute for periods when the foreign state was immune, despite clear congressional direction to the contrary, in the guise of a plain reading of the statute.

**B.**    **Cubatabaco and Cubaexport May Attack the Underlying Judgment for Lack of Personal and Subject Matter Jurisdiction**

**1.**    **Cubatabaco and Cubaexport Are Entitled to Attack the Judgment Because the Republic of Cuba Would Be Entitled to Do So**

The Supreme Court has held in no uncertain terms that "[a] defendant is *always* free to ignore the judicial proceedings, risk a default judgment, and then *challenge that judgment on jurisdictional* grounds in a collateral proceeding."  *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 706 (1982) (emphasis supplied).  The Eleventh Circuit has held likewise:  "where *the defendant does not appear, and judgment is by default*, the state court judgment *does not preclude* the federal court from reviewing the jurisdictional issues.... We are thus *required* to review the jurisdictional issues in this case."  *Am. Steel Bldg. Co., Inc. v. Davidson & Richardson Const. Co*., 847 F.2d 1519, 1521-22 (11th Cir. 1988) (emphasis added).

In *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543 (D.C. Cir. 1987), the Court of Appeals allowed the foreign state, in an execution proceeding, to attack the default

judgment based on a lack of subject matter jurisdiction under FSIA § 1605(a)(2), holding that a defendant has an election to appear and defend or "expos[e] himself to the risk of a default judgment.  When enforcement of the default judgment is attempted, however, he may assert his [subject matter or personal] jurisdictional objection.  If he prevails ... *the default judgment will be vacated.*"  *Id.* at 1547.  The courts in *Trans Commodities, Inc. v. Kazakstan Trading House, S.A.*, 1997 WL 811474, at \*2-5 (S.D.N.Y. May 28, 1997), and *LeDonne v. Gulf Air, Inc.*, 700 F. Supp. 1400 (E.D. Va. 1988), entertained collateral attacks on default judgments for lack of FSIA subject matter and personal jurisdiction in enforcement proceedings removed from state court. *See also Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151-54 (D.C. Cir. 1994).  A finding by the rendering court in a default proceeding that it has FSIA jurisdiction is entitled to no weight in a subsequent attack.  *See Jackson v. People's Republic of China*, 794 F.2d 1490, 1496 n.3 (11th Cir. 1983) (district court must "examine the jurisdictional issue free of any inferences that might flow from the existence of the [default] judgment").

The Supreme Court and the Eleventh Circuit have long recognized that the general obligation of a federal court (or a court of a different state) to give full faith and credit to the final judgment of a state court is "subject to an important limitation":  "'If that court did not have jurisdiction over the subject matter or the relevant parties, full faith and credit need not be given.'"  *American Steel Bldg. Co., Inc. v. Davidson & Richardson Constr. Co.*, 847 F.2d 1519, 1521 (11th Cir. 1988) (quoting *Underwriters Nat'l Assurance Co. v. North Carolina Life & Accident & Health Ins. Guaranty Ass'n*, 455 U.S. 691, 705 (1982)); *see also Simanonok v. Simanonok*, 787 F.2d 1517, 1522 (11th Cir. 1986) ("[F]ull faith and credit will not be given a judgment if the rendering court did not have jurisdiction over the parties and the subject matter.") (internal quotation omitted). In response to a challenge to the rendering court's subject matter

jurisdiction, the Supreme Court in *Underwriters* held that the original judgment was entitled to full faith and credit only because the record demonstrated that the issue of subject matter jurisdiction was "'fully and fairly litigated and finally decided" by the rendering court in a proceeding in which respondents had actively participated. 455 U.S. at 706-07.

To the same effect, a judgment debtor is entitled under Florida law to attack in enforcement proceedings a default judgment based on a lack of personal or subject matter jurisdiction.[11] *See Williams v. Cadlerock Joint Venture, L.P.*, 980 So.2d 1241, 1243 (Fla. Dist. Ct. App. 2008) ("[a] foreign judgment need not be recognized if the foreign court lacked either personal or subject matter jurisdiction"; defendant who suffered a default judgment "may raise the issue subsequently in a proceeding brought to enforce the judgment"); *Whipple v. JSZ Fin. Co., Inc.*, 885 So.2d 933, 936 (Fla. Dist. Ct. App. 2004) (after default in one state court, defendant "may raise the [jurisdictional] issue subsequently in a proceeding brought to enforce the judgment."); *In re Estate of O'Keefe*, 833 So.2d 157, 160 (Fla. Dist. Ct. App. 2002); *Best Form, Inc. v. Richards Prods., Inc.*, 631 So.2d 1123, 1124 (Fla. Dist. Ct. App. 1994); *George Vining & Sons, Inc. v. Jones*, 498 So.2d 695, 697 (Fla. Dist. Ct. App. 1986).

Since, as shown, the judgment debtor would be entitled to attack the underlying judgment, Impleader Defendants may do the same. In demanding execution, Plaintiff must, and does, rely on TRIA, which provides in relevant part:

> Nowithstanding any other provision of law … a person [who] has obtained a judgment against a terrorist party on a claim … for which the terrorist part is not immune under

---

[11] Federal courts must permit, at a minimum, whatever post-judgment attacks on a state court judgment that are permissible under state law. *See Fehlhaber v. Fehlhaber*, 681 F.2d 1015, 1020 (5th Cir. 1982), citing *New York ex rel. Halvey v. Halvey*, 330 U.S. 610, 614-15 (1947); *Williams v. North Carolina*, 325 U.S. 226, 228-29 (1945); *see also Underwriters Nat'l Assurance Co.*, 455 U.S. at 704 & n.9; *Johnson*, 340 U.S. 581, 587 (1951); *Vazquez v. Metro. Dade County*, 968 F.2d 1101, 1106 (11th Cir. 1992) (state law governs effect of previous state court judgment sought to be enforced in federal court).

> section 1605(7) … the blocked assets of that terrorist party *(including the blocked assets of any agency or instrumentality of that terrorist party)*, shall be subject to execution … in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable. TRIA, § 201(a) (emphasis supplied)

By the italicized language, TRIA eliminates the juridical distinction between a foreign state and its agencies and instrumentalities, which must otherwise be respected under *First National City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*"); *see also Alejandre v. Telefonica Larga Distancia de Puerto Rico, Inc.*, 183 F.3d 1277 (11th Cir. 1999) (applying *Bancec*, rejecting pre-TRIA attempt to execute a § 1605(a)(7) judgment against the Republic of Cuba upon property of a Cuban "agency or instrumentality"). As a result, Cubatabaco and Cubaexport are entitled to assert the same objections to the rendering court's jurisdiction that the Republic of Cuba would be entitled to assert.

This is shown by *Letelier v. Republic of Chile*, 748 F.2d 790 (2d Cir. 1984), endorsed by the Eleventh Circuit in *Alejandre*, 183 F.3d at 1284. The Second Circuit refused remand for a hearing on whether the Chilean national airline, LAN, despite its formal separate juridical status, should be considered the Republic of Chile's alter ego, and hence its property available for satisfaction of a default judgment against Chile. The Circuit held that remand would be futile because, if LAN were found to be Chile's alter ego on remand, then *LAN* could assert *Chile's* immunity from execution under FSIA § 1610(a). *See Letelier*, 784 F.2d at 799.

In *Alejandre*, the Eleventh Circuit embraced and applied *Letelier*'s reasoning in holding that § 1610(a)'s exception to the Republic of Cuba's immunity from execution would apply to a Cuban agency or instrumentality if it were found to be the Republic's alter ego. 183 F.3d at 1284-85; *see also Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080, 1095 (9th Cir. 2007) (in proceeding to execute upon property of an instrumentality of the Republic of Congo in satisfaction of a default judgment against Congo, Ninth Circuit rejected argument that

14

instrumentality's "immunity from execution is governed by ... 28 U.S.C. § 1610(b) [for instrumentalities] ... rather than the more restrictive standard of § 1610(a) [for foreign states] .... because ... SNPC was an alter ego of the Congo, and an alter ego is not a separate legal entity") (internal quotation omitted). Following *Letelier*, the Fifth Circuit held in *Walker Int'l Holdings Ltd. v. Republic of Congo*, 395 F.3d 229, 238 (5th Cir. 2004) that "[u]nder the alter ego theory, SNPC's property could only be attached if [Congo's] property ... could be attached."

### 2. Cubatabaco and Cubaexport Are Entitled to Attack the Underlying Judgment As Third-Party Impleader Defendants

The impleading of third parties upon an unsatisfied writ of execution "does not in itself establish liability on the part of the impleaded third parties.... Rather it gives them an opportunity to raise their defenses and protect their interests." *Allied Indus. Int'l, Inc. v. AGFA-Gevaert, Inc.*, 688 F. Supp. 1516, 1518 (S.D. Fla. 1988); *see Wieczoreck v. H & H Builders, Inc.*, 450 So.2d 867, 871 (Fla. Dist. Ct. App. 1984); 2 Stephen B. Rakusin, *Florida Creditor's Rights Manual* ("Rakusin") § 8.02[E], at 8-86 to 8-89 (2004).

Florida courts have long permitted collateral attacks on default judgments by third parties in enforcement proceedings, based on the rendering court's lack of personal or subject matter jurisdiction. In *Blatch v. Wesley*, 238 So.2d 308, 310 (Fl. Dist. Ct. App. 1970), for example, the court held that "[a] garnishee may raise by way of defense the invalidity of the judgment which is the basis for the garnishment after judgment." *See Shannon v. Great S. Equip. Co.*, 326 So.2d 19, 21 (Fla. Dist. Ct. App. 1976) (after default judgments against defendant and garnishee, garnishee successfully challenged garnishment on the ground of lack of personal jurisdiction over defendant; because "no valid judgment can be or was entered against . . . the original defendant . . . no valid judgment in garnishment against [the garnishee] can be predicated thereon"); *Great Am. Ins. Co. v. Bevis*, 652 So.2d 382, 383 (Fla. Dist. Ct. App. 1995) (judgment

15

debtor's alleged insurer permitted to attack default judgment; judgment is "void for lack of personal jurisdiction and *may be collaterally attacked* at any time") (emphasis added); *cf. Norwich Union Indem. Co. v. Willis,* 168 So. 418, 421 (Fla. 1936) (garnishee's non-jurisdictional attack on judgment rejected, because "on collateral attack only jurisdictional infirmities can be considered"); *Windsor-Thomas Group, Inc. v. Parker,* 782 So.2d 478, 483 (Fla. Dist. Ct. App. 2001) (permitting garnishee to raise property's statutory exemption from garnishment, although judgment debtor failed to raise issue, because garnishee's potential economic injury gives it "an interest sufficient to provide it standing to assert this statute's protection from garnishment").

## II.   Execution Is Possible Only Pursuant to the Terrorism Risk Insurance Act, But TRIA Is Inapplicable Because the Republic of Cuba Is Immune on the Underlying Claim

Plaintiff must rely on TRIA in seeking execution, as she acknowledges.[12]  TRIA applies only when "a person has obtained a judgment against a terrorist party on a claim … for which a terrorist party *is not immune* under section 1605(a)(7) ...."  TRIA, § 201(a) (emphasis added).[13] Thus, in addition to Impleader Defendants' right to attack the underlying judgment for lack of jurisdiction, TRIA, by the "plain meaning" of its language, requires this Court to make its own independent determination whether the Republic of Cuba "is not immune under section

---

[12]  As already noted,TRIA provides a limited statutory exception (a) to the CACR's prohibition against execution of a judgment against property in which Cuba or a Cuban national has an interest, unless OFAC has specifically licensed the demanded execution, 31 C.F.R. §§ 515.201(b), 515.310; (b) to the FSIA's immunity of the property of a foreign state and of its agencies and instrumentalities from execution, and (c) to the federal rule of law that the property of agencies and instrumentalities of a foreign state cannot be executed upon in satisfaction of a judgment against the foreign state.

[13]  The State Court did not rely on the alternative clause, "a claim based on an act of terrorism," and neither does Plaintiff.  Impleader Motion, ¶¶ 22-26.  TRIA, § 201(d)(1) defines an "act of terrorism" by reference to other statutes, and there could be no plausible claim that the acts sued upon come within their definitions.

1605(a)(7)" before ordering execution.  As shown above, the Republic of Cuba is immune.

Had Congress meant for TRIA to apply whenever there was a judgment under FSIA § 1605(a)(7), rather than when a defendant "*is not immune* under § 1605(a)(7)," it would have been a simple matter to say so:  it could have provided that TRIA applies when "a person has obtained a judgment against a terrorist party on a claim ... *brought under* section 1605(a)(7)."

Indeed, Congress used precisely that language when directing the Treasury Department in 2000 to use public funds to pay each judgment holder an amount equal to the "compensatory damages awarded by judgment of a court on a claim or claims *brought* by the person *under* section 1605(a)(7) ...." Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, § 2002(a)(1)(A), 114 Stat. 1543 (2000) ("Victims Act") (emphasis added).  Similarly, for judgments against foreign states under FSIA § 1605(a)(3), Congress provided an exception to immunity from execution if "the execution relates to a judgment *establishing rights in property* which has been taken in violation of international law."  FSIA § 1610(a)(3) (emphasis added).

When, as here, "the words of a statute are unambiguous … judicial inquiry is complete." *CBS Inc. v. Primetime 24 Joint Venture*, 245 F.3d 1217, 1222 (11th Cir. 2001) (internal quotations omitted).  "The rule is that we must presume that Congress said what it meant and meant what is said." *Id.* (internal quotations omitted).[14]

Although there is no warrant for the Court to go behind TRIA's "plain meaning," the requirement that the Court make its own determination of immunity under TRIA is perfectly

---

[14] *See also Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253-54 (1992).  *U.S. v. LaBonte*, 520 U.S. 751, 757 (1997) ("We do not start from the premise that [the statutory] language is imprecise.  Instead we assume that in drafting legislation, Congress said what it meant.") (quoted in *CBS Inc*., 245 F.3d at 1222); *Commodity Futures Trading Comm'n. v. Mass Media Mktg., Inc.,* 156 F. Supp. 2d 1323, 1329 (S.D. Fla. 2001) (Graham, J.); *A Choice for Women v. Butterworth,* 54 F. Supp. 2d 1148, 1157 & n.4 (S.D. Fla. 1998) (Graham, J.).  "Congress knows how to use specific language." *Shotz v. City of Plantation, Fla.,* 344 F.3d 1161, 1167 (11th Cir. 2003).

understandable, and consistent with the overall statutory scheme.   Congress had been recently

informed that virtually all § 1605(a)(7) judgments had been by default.  *See* Congressional

Research Service, *Report for Congress, Suits Against Terrorist States*, January 25, 2002, at 6.  In

expanding the entities and assets against which execution could be sought, Congress reasonably

could have meant to ensure the opportunity for an adversarial proceeding on the immunity issue

at the point of execution.

      Moreover, TRIA necessarily implicates the President's authority under TWEA:  when

TRIA is applicable, the President loses TWEA authority over executions.  Therefore, the

requirement that the court, at the point of execution, determine whether TRIA is applicable

because the judgment is on a claim for which the foreign state "is not immune" protects the

President's TWEA authority from improper encroachment.

## III.   THE COURT LACKS PERSONAL JURISDICTION OVER THE IMPLEADER DEFENDANTS

      Under Florida law, a proceeding supplementary to execution "constitutes a separate legal

cause from that of the main suit in which the judgment is procured."  *Advertects, Inc. v. Sawyer*

*Indus., Inc.*, 84 So.2d 21, 23 (Fla. 1955); *Nestor v. Dependable Ins. Co*., Inc., 535 So.2d 710, 710

(Fla. Dist. Ct. App. 1988); 2 Rakusin, § 8.02[A], at 8-5 & n.4.  In order to determine rights in

property of a non-party to the original judgment, that person "must be made an actual party to the

supplementary proceedings."  2 Rakusin, § 8.02[E], at 8-67 & n.330.  And, to do so, the court

necessarily must obtain personal jurisdiction over him in that supplementary proceeding.  *See*

*Harbaugh v. Greslin*, 436 F. Supp. 2d 1315, 1319-22 (S.D. Fla. 2006).[15]

      Plaintiff erroneously and exclusively relies on 28 U.S.C. § 1330(b) for personal

---

[15]  *See also, e.g*., *Tabet v. Tabet*, 644 So.2d 557, 559 (Fla. Dist. Ct. App. 1994*); Mission Bay Campland, Inc. v. Sumner Financial Corp*., 71 F.R.D. 432, 434 (M.D. Fla. 1976); *Bally Case & Cooler, Inc. v. H. Kaiser Assoc., Inc.*, 514 F. Supp. 352, 354-55 (S.D. Fla. 1981).

jurisdiction.  That section, however, is inapplicable because it provides personal jurisdiction over a foreign state (or its agency or instrumentality) *only* for claims within 28 U.S.C. § 1330(a), that is, claims as "to which the foreign state is not entitled to immunity …under sections 1605-1607 of [the FSIA]."  Plaintiff's claim against Impleader Defendants is based solely on *TRIA*, *not* 28 U.S.C. §§ 1605-07, and, thus, section 1330(b) simply has no application here.[16]

Because § 1330(b) does not provide a basis for personal jurisdiction here, and because Plaintiff has not pled any facts or any other basis to support personal jurisdiction, the Impleader Action must be dismissed.  "The plaintiff has the initial burden to plead 'sufficient material facts to form a basis' for the exercise of personal jurisdiction."  *USA Flea Market LLC v. EVMC Real Estate Consultants, Inc.*, 2008 WL 3540466, at *6 (M.D.Fla. Aug. 12, 2008) (quoting *Walack v. Worldwide Machinery Sales, Inc.,* 278 F. Supp. 2d 1358, 1365 (M.D. Fla. 2003)); *see also Cable/Home Communication Corp. v. Network Prods., Inc.,* 902 F.2d 829, 855 (11th Cir. 1990) (plaintiff's burden is to state a "prima facie case of personal jurisdiction over the nonresident defendant").  The evidentiary burden shifts only when "the plaintiff pleads facts sufficient to establish" personal jurisdiction. *USA Flea Market*, 2008 WL 3540466, at *6.  Otherwise, the complaint must be dismissed, and plaintiff cannot cure its pleading defect in response to a motion to dismiss.  *Id*. at *7; *Corneal v. CF Hosting, Inc.*, 187 F. Supp. 2d 1372, 1372-75 (S.D. Fla. 2001) (dismissing complaint for failure to plead sufficient personal jurisdiction facts); *see also Santilli v. Cardone*, 2008 WL 4534138, at *1-2 (M.D. Fla. Oct. 7, 2008) (same).

Plaintiff understandably makes no allegation that the Florida Long-Arm Statute, F.S.A.

---

[16]  Plaintiff cites *Weininger v. Castro*, 462 F. Supp. 457, 491-93 (S.D.N.Y.  2006), Impleader Motion, ¶ 18, but the court did not address whether § 1330(b) is inapplicable because TRIA claims are not claims under §§ 1605-07, and thus are outside § 1330(a).  Neither the garnishee nor the *amicus* there raised the issue, and no Cuban party appeared.

§ 48.193, applies.  Even if it was legally relevant, Plaintiff does not, and cannot, assert any necessary factual predicates for the statute's application.  (*See* Garrido and Santiago Pichardo Declarations).  Likewise, Plaintiff does not, and cannot, make any showing that Impleader Defendants have sufficient contacts with Florida to satisfy the requirements of minimum contacts.  *See Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1545 (11th Cir. 1993); *Guevara v. Republic of Peru*, 468 F.3d 1289, 1305-06 (11th Cir. 2006).  As shown in the Garrido and Santiago Pichardo Declarations, Cubatabaco and Cubaexport have no jurisdictionally relevant contacts with Florida whatsoever.[17]

Notably, Plaintiff makes no allegation that Impleader Defendants have property located in Florida (they do not), and she does not claim to proceed *in rem* against any purported property here.  Pursuant to CACR, 31 CFR § 515.527, and the Lanham Act, 15 U.S.C. § 1058(b)(2) (permitting maintenance of registrations based on excusable non-use), the *only* property in the United States that Impleader Defendants own or in which they have an interest are their registrations (and applications) at the USPTO, located in Virginia, not Florida.  In a closely analogous situation, the Lanham Act authorizes "an in rem civil action against a domain name *in*

---

[17]  Certain of Cubatabaco's marks have been advertised in national special interest cigar magazines published by a New York company, and it has been involved in unrelated litigation with forum residents outside the forum; over 20 years ago, Cubaexport was involved in unrelated litigation in the forum.  *See* Garrido Decl. ¶¶ 4-6; Santiago Pichardo Decl. ¶¶ 6-7.  Advertisements in a national circulation magazine, unaccompanied by sale of the advertised products, are jurisdictionally irrelevant.  *See Lawson Cattle & Equip., Inc. v. Pasture Renovators LLC,* 139 Fed. Appx. 140, 143 (11th Cir. 2005) ("[M]erely advertising in magazines of national circulation that are read in the forum state is not a significant contact for jurisdictional purposes.") (internal quotations omitted); *Johnston v. Frank E. Basil, Inc.*, 802 F.2d 418, 419-20 (11th Cir .1986) (advertisements in newspaper not sufficient connection to forum for *in personam* jurisdiction).  Likewise, prior litigation against forum residents cannot support jurisdiction even when brought in the forum state, and even when, unlike here, the causes are related.  *See U.S. v. Subklew*, 2001 WL 896473, at *3 (S.D. Fla. June 5, 2001); *Trus. of Columbia Univ. v. Ocean World, S.A.*, 12 So.3d 788, 795 (Fla. Dist. Ct. App. 2009); *Milberg Factors, Inc. v. Greenbaum*, 585 So.2d 1089, 1092 (Fla. Dist. Ct. App. 1991).

*the judicial district in which the domain name registrar [or] registry ... is located*," 15 U.S.C. § 1125(d)(2)(A), and "a domain name shall be *deemed to have its situs in the judicial district in which the domain name registrar, [or] registry* … is located," *id.* § 1125(d)(2)(C)(i) (emphasis added).

Even in the ordinary case (precluded here by the CACR), in which a trademark is used in commerce in the U.S., a trademark is not considered to be property in every State, such that jurisdiction or venue in infringement/ownership disputes exists anywhere in the U.S., but rather only where the allegedly infringing activity has occurred, or where the trademark owner resides. *See Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008); *J.B. Oxford Holdings, Inc. v. Net Trade, Inc.*, 76 F. Supp. 2d 1363, 1366 (S.D. Fla. 1999); *Nida Corp. v. Nida*, 118 F. Supp. 2d 1223, 1228 (M.D. Fla. 2000). If a trademark in commercial use was property located in all States, there would be no need for the prevalent, complex venue and jurisdictional analyses. *See* 6 J. McCarthy § 32:63 & nn.12-14 (discussing venue and citing cases addressing venue under section 1391(b)(2) solely by reference to where a "substantial part of the events" occurred; and not under the "property ... is situated" prong). If trademarks *in commercial use* are not property everywhere in the U.S., then plainly Impleader Defendants' registrations and applications in the USPTO in Virginia cannot be "property" in Florida.

Similarly, Fed. R. Civ. P. 4(k)(2) cannot aid Plaintiff. It authorizes personal jurisdiction in federal court on a federal claim based on contacts with the United States as a whole *if, and only if*, "(A) the defendant is *not subject to jurisdiction in any state's courts* of general jurisdiction." The Rule is inapplicable here because the courts of Virginia have personal jurisdiction: the USPTO, which issued the registrations and maintains them on its registry, is located there, and Impleader Defendants have had contacts with that District by applying to the

USPTO for registrations, prosecuting applications, renewing registrations, and engaging in other proceedings. Garrido and Santiago Pichardo Decls.; *see also* App. 7. If the defendant identifies a State where jurisdiction is possible – here, Virginia – Rule 4(k)(2)'s national contacts test cannot be applied. *See Oldfield v. Pueblo de Bahia Lora, S.A.*, 558 F.3d 1210, 1220 n.22 (11th Cir. 2009); *ISI Int'l, Inc. v. Borden Ladner Gervais LLP,* 256 F.3d 548, 552 (7th Cir. 2001).[18]

## IV.     VENUE IS IMPROPER IN THIS DISTRICT

This case should be dismissed for improper venue, or transferred to the Eastern District of Virginia pursuant to 28 U.S.C. § 1406(a).[19] As part of the FSIA's "comprehensive statutory scheme," *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 435 n.3 (1989), Congress enacted detailed venue provisions exclusively for actions against foreign states or their agencies or instrumentalities, 28 U.S.C. § 1391(f)(1)-(4), none of which provides venue here.[20]

As a general matter, removal under 28 U.S.C. § *1441(a)* has been held to "establish[] federal venue in the district where the state action was pending." *Hollis v. Fla. State Univ.*, 259 F.3d 1295, 1300 (11th Cir. 2001). However, consideration of the different, special FSIA venue and removal provisions (§ *1441(d)*) in the context of the FSIA's "comprehensive statutory

---

[18]  Since its enactment in December 1993, courts have regularly applied Rule 4(k)(2) in FSIA cases. *See Nabulsi v. H.H. Sheikh Issa Bin Zayed Al Nahyan*, 2007 WL 2126542, at *9 (S.D. Tex. July 19, 2007) *vacated on other grounds*, 2007 WL 2964817 (S.D. Tex. Oct. 9, 2007); *URS Corp. v. Lebanese Co. for Dev. & Reconstr. of Beirut Cent. Dist. SAL,* 512 F. Supp. 2d 199, 216 n.20 (D. Del. 2007) (*dictum*); *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 109 (D.D.C. 2005).

[19]  The Court may consider whether venue is proper without first determining its personal and subject matter jurisdiction. *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 429, 432-36 (2007); *In re Limitnone, LLC*, 551 F.3d 572, 576-77 (7th Cir. 2008); *Aftab v. Gonzalez*, 597 F. Supp. 2d 76, 79 (D.D.C. 2009). By separate motion, Impleader Defendants will also seek transfer of venue under 28 U.S.C. § 1404(a) to the Eastern District of Virginia.

[20]  No property that is the "subject of the action is situated" in this District; "a substantial part of the events or omissions giving rise to the claim" did not occur here; and the Impleader Defendants are not "licensed to do business" and are not "doing business" here.

scheme" mandates dismissal or transfer for improper venue.  First, Congress specifically authorized venue where – unlike here – property at issue is situated, because "[*n*]*o hardship* will be caused to the foreign state if it is subject to suit where it *has chosen to place the property* that gives rise to the dispute." H. Rep. No. 94-1487, at 32 (1976) (emphasis added).

Second, nothing in the FSIA or its legislative history suggests that Congress contemplated that removal would trump the FSIA's special and comprehensive venue provisions. *Id*. at 32.  To the contrary, the House Report states, "Upon removal, the action would be heard and tried by the *appropriate* district court sitting without a jury."  *Id*. at 33 (emphasis added). Congress' reference to the "appropriate" district court makes no sense if the FSIA venue provisions do not apply to removed actions.  Further, Congress meant to encourage removal by foreign sovereigns, not burden it by forfeiting the special venue protections of § 1391(f).[21] Third, finding that removal fixes venue in the removed court would result in the anomaly in which, despite Congress's careful attention to venue and ease of removal in FSIA cases, a plaintiff could bring suit against a foreign sovereign in *state* court *anywhere* in the U.S. where it could obtain personal jurisdiction, and by the sovereign's anticipated removal, override § 1391(f).[22]

## V.   BECAUSE TRIA IS INAPPLICABLE, THE CUBAN ASSETS CONTROL REGULATIONS BAR EXECUTION

---

[21] "In view of the potential sensitivity of actions against foreign states and the importance of developing a uniform body of law in this area, it is important to give foreign states clear authority to remove to a Federal forum actions brought against them in the State courts."  H. Rep. No. 94-1487, at 32.

[22] Only two cases have addressed venue in removed FSIA actions.  One conclusorily rejected application of § 1391(f) based on § 1441(a), without considering whether the FSIA's "comprehensive statutory scheme" required a different result.  *See Translinear, Inc. v. Rep. of Haiti*, 538 F. Supp. 141, 144 (D.D.C. 1982).  The second case, *Ratnaswamy v. Air Afrique*, 1996 WL 507267, *11-12 (N.D. Ill. Sept. 4, 1996), merely follows *Rep. of Haiti*.

The CACR prohibit execution upon any property in which Cuba or any Cuban national has an interest, *unless* execution is specifically licensed by OFAC. *See* 31 C.F.R. §§ 515.201(b), 515.310. Lacking an OFAC license, Plaintiff relies upon TRIA but, as shown, Point II, TRIA is inapplicable because the claim upon which judgment was entered is *not* a "claim … for which a terrorist party is not immune under section 1605(a)(7)." TRIA, § 201(a).

TRIA is also inapplicable because OFAC's General License for registrations, 31 C.F.R. § 515.527, and federal legislation, 50 U.S.C. App. § 5(b)(4), allow the Cuban parties to obtain registrations, surrender them, and use the registered trademarks (in advertising now, and sales in the future). In contrast, TRIA applies only to assets that, unlike the registrations, are "seized or frozen," and expressly excludes property that, like the registrations, "is subject to a license issued by the United States Government for final … transfer, or disposition by or to a person subject to the jurisdiction of the United States in connection with a transaction for which the issuance of such license has been specifically required by" TWEA. TRIA, § 201(d)(2)(A) & (B)(i). The trademark registrations are far from being subject to the "across-the-board prohibition" that places property within TRIA. *Weinstein v. Islamic Republic of Iran*, 299 F. Supp. 2d 63 (E.D.N.Y 2004)

The CACR provides a General License, 31 C.F.R. § 515.527(a)(1), authorizing "[t]ransactions related to the registration and renewal in the [USPTO] … of … trademarks in which the Government of Cuba or a Cuban national has an interest." Pursuant to that General License, the USPTO issued the trademark registrations, which the CACR otherwise would prohibit it from doing. *See* 31 C.F.R. §§ 515.201(b); 515.310; 515.311; *Empresa Cubana del Tabaco*, 399 F.3d at 474-477. As OFAC has authoritatively explained, the General License "[is] intended to provide reciprocal protection for the intellectual property of Cuba and the United

States," OFAC Director, letter ruling (Aug. 19, 1996) (App. 1); the Republic of Cuba has allowed hundreds of U.S. companies to register over 4,000 trademarks in Cuba.[23]

Registration under the General License provides Cuban owners with the right to use their marks in the U.S. in connection with the sale of their products when trade with Cuba resumes, just as registration of U.S. trademarks in Cuba affords reciprocal rights to U.S. companies. In both countries, registration prevents others from obtaining priority of right before trade resumes; and provides a defense against infringement actions when the registrants begin sales. *See* Lanham Act, §§ 2(d), 32-35; 15 U.S.C. §§ 1052, 1114-1117. Impleader Defendants Cubatabaco and Cubaexport cannot currently use their trademarks in the U.S. on cigar or rum products, but that is only because the CACR prohibit sale of their *products* in the U.S. at the present time, not because of any prohibition applicable to the registered trademarks.

Moreover, Cubatabaco and Cubaexport have the statutory right to use their registered trademarks *now*, in paid advertisements in the U.S. *See* OFAC Director, letter ruling (Nov. 20, 1997) (App. 8). Cubatabaco advertises, Garrido Decl. ¶ 6, in order to develop brand recognition and commercial advantage when trade is permitted. *See Empresa Cubana del Tabaco v. Culbro Corp.*, 70 U.S.P.Q.2d 1650, 1666-67 (S.D.N.Y. 2004), *rev'd. on other grounds*, 399 F.3d 462 (2d Cir. 2005).[24]

---

[23] *An Examination of Section 211 of the Omnibus Appropriations Act of 1998, Before the Senate Committee on the Judiciary*, 108th Cong. 2d Sess. 40 (2004) (Nat'l Foreign Trade Council).

[24]  As the OFAC Director acknowledged, advertising comes within the statutory exemption from TWEA regulation for the importation of information or informational materials, and their reproduction and dissemination in the U.S. upon importation. *See* TWEA § 5(b)(4). Trademarks are information and informational materials. *See, e.g.,* Lanham Act, § 45, 15 U.S.C. § 1127 (" any word, name, symbol… used …to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.")

General License § 515.527 authorizes Cuban owners to *surrender* their trademark registrations, and the USPTO to cancel them on surrender (pursuant to Lanham Act § 7(c); 15 U.S.C. § 1057).  The CACR otherwise prohibit the "surrender" of any right to or interest in property in which Cuba or Cuban nationals have an interest.  *See* 31 C.F.R. §§ 515.201(b), 515.310, 515.311.

The only CACR restraint is a prohibition against transferring the registration to a third-party.  *See* 31 C.F.R. § 515.201(b).  Meant to deny Cuban owners the possibility of generating hard currency at the present time by selling their U.S. registrations, *Havana Club Holding, S.A. v. Galleon, S.A.*, 203 F.3d 116, 124 (2d. Cir. 2000), this restriction does not preclude current or future use of the registered trademarks *by the Cuban owner*.

In light of the above, it is clear that TRIA's "license" exclusion applies by its plain terms.  Tracking TRIA's language, the registrations are "subject to a license issued by the United States Government" – General License § 515.527 – "for final . . . transfer . . . by . . . a person subject to the jurisdiction of the United States" – the USPTO's issuance of registrations to Cubatabaco and Cubaexport – "in connection with a transaction for which the issuance of such license has been specifically required" by TWEA.  Similarly, the disjunctive provision in TRIA's "license proviso" concerning "disposition" applies by its terms.  TRIA, § 201(d)(2)(B)(i).

The registered trademarks are also not "seized or frozen," as required for TRIA to apply.

The "plain meaning" rule requires this conclusion: there is no restraint on Cubatabaco and Cubaexport obtaining registrations; surrendering their registrations; using the registered trademarks *now* in advertisements; and using the registered trademarks on products that may be lawfully imported.

In *Weinstein v. Islamic Republic of Iran*, recognized for its "persuasive analysis" by the

Second Circuit, *Bank of New York v. Rubin*, 484 F.3d 149, 150 (2d Cir. 2007), the court held that a "freezing" of assets within the meaning of TRIA "imposes an *across-the-board prohibition* against transfers or transactions of any kind with regard to the property," *Weinstein,* 299 F. Supp. 2d at 75 (emphasis supplied; internal quotations and citations omitted).  *See also* both the district court and Second Circuit's decisions in *Bank of New York v. Rubin,* 2006 WL 633315 (S.D.N.Y. Mar. 15, 2006), *aff'd*. 484 F.3d 149 (2d Cir. 2007) (adopting *Weinstein*).  Registered trademarks are not subject to "across-the board-prohibition."  Compare the bank accounts executed upon in *Weininger v. Castro*, 462 F. Supp. 2d 457 (S.D.N.Y. 2006) pursuant to TRIA.

The *Weinstein* court's recognition that TRIA applies only to property subject to "across-the-board" prohibition is supported by contrasting TRIA with Congress' framing of other legislation on the same subject.  At the time of TRIA's passage, FSIA § 1610(f) authorized (subject to Presidential waiver) execution upon any property with respect to which financial transactions are "prohibited *or regulated*" under TWEA in satisfaction of FSIA § 1605(a)(7) judgments.  Victims Act, Pub. L. No. 106-386, § 2002(g)(1), 114 Stat. 1543 (2000) (emphasis supplied).  *U.S. v. DBB, Inc.*, 180 F.3d 1277, 1282-83 (11th Cir. 1999) (endorsing as compelling construction of statute by comparison with language used in prior legislation).  Transactions with respect to the registered trademarks are "regulated" (and even exempt from regulation in important respects), not "frozen," and thus are outside of TRIA.

As this Circuit has often held, a "long history of established meaning is important, because we readily presume that Congress knows the settled legal definition of the words it uses, and uses them in the settled sense."  *CBS Inc.*, 245 F.3d at 1223 (internal quotation omitted).  Both the courts and the Executive have consistently used the term "frozen" in the TWEA context in a manner completely inconsistent with its application to Cuban trademark registrations. They

have emphasized that (a) a "freeze" of assets "preserve[s] the assets involved for possible use in some satisfaction of American claims against the country involved," consistent with the U.S.'s historic practice of distributing frozen assets to U.S. claimants against a foreign state pursuant to a negotiated claims settlement agreement or unilateral vesting and distribution, *De Cuellar v. Brady*, 881 F.2d 1561, 1569 n.8 (11th Cir. 1989) (internal quotation omitted);[25] (b) TWEA and IEEPA "permit the President to maintain the frozen assets at his disposal for use in negotiating the resolution of a declared national emergency. The frozen assets serve as a 'bargaining chip' to be used by the President when dealing with a hostile country," *Dames & Moore v. Regan*, 453 U.S. 654, 673 (1981) (freezing and return of Iranian funds to resolve Iranian Hostage Crisis); and (c) permitted the President to "immobilize[] … assets . . . until the Government could determine whether those assets were needed [by it] for prosecution of the …war," *Propper v. Clark*, 337 U.S. 472, 484 (1949).[26] OFAC has explained that assets subject to "blocking or 'freezing'" form a "pool … for possible use in the settlement of U.S. claims and/or for use as a bargaining chip or lever in negotiating an eventual normalization of relations." App. 9, at 3.

Congress and the Executive have long considered that the United States would follow the practice of using "frozen" Cuban assets to compensate U.S. nationals with claims against Cuba certified to the Secretary of State by the Foreign Claims Settlement Commission, consistent with historic practice. *See De Cuellar*, 881 F.2d at 1569-1570.

---

[25] *See also, e.g., Richardson v.Simon*, 560 F. 2d 500, 505 (2d Cir. 1977); *Miranda v. Sec'y of the Treasury*, 766 F.2d. 1, 4 (1st Cir. 1985); *Nielsen v. Sec'y of the Treasury*, 424 F.2d 833, 840-841 (D.C. Cir. 1970).

[26] *See also, e.g., Orvis v. Brownell*, 345 U.S. 183 (1953) (W.W. II "freezing" of Japanese assets preliminary to vesting them in the U.S.); *Zittman v. McGrath*, 341 U.S. 471 (1951) and *Zittman v. McGrath*, 341 U.S. 446 (1951), (W.W. II "federal freezing program" that vested foreign-owned assets for the benefit of American creditors, who could assert claims against the vested funds); *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 736 (1976) (Marshall, J., dissenting on other grounds) (distribution to U.S. claimants).

In sharp contrast to this "long history of established meaning," *CBS Inc.*, 245 F.3d at 1223, it has never been suggested – and it would be absurd to suggest – that the United States has licensed the registration of Cuban trademarks so that, one day, they can be seized to provide compensation to U.S. claimants against Cuba, used as a "bargaining chip," or vested.  Rather, the United States *expressly* permits registration for the *opposite* purpose:  to guarantee that Cuban companies can use their trademarks in the U.S. after trade resumes by allowing them to obtain registrations now, and for the United States thereby to obtain "reciprocal protection" from Cuba for U.S. trademarks. OFAC Director, letter ruling (Aug. 19, 1996) (App. 1).  Telling, and not surprisingly, OFAC does *not* include registered trademarks in its census of "frozen" properties.[27]

Given TRIA's "plain meaning," there is no need to resort to legislative history, but in any event, it adds powerful confirmation.  TWEA § 5(b)'s "sweeping statutory language," *Regan v. Wald*, 468 U.S. 222, 236 n.16 (1984), and the "the legislative history and cases interpreting the TWEA fully sustain the broad authority of the Executive when acting under this congressional grant of power," *Dames & Moore v. Regan*, 453 U.S. 654, 672 (1981). The President's authority flows from the need to shape and shift economic sanctions in furtherance of foreign policy. *Id. See also American Ins. Ass'n. v.  Garamendi,* 539 U.S. 396, 414 (2003) (Constitution commits "vast share of responsibility for the conduct of our foreign relations" to President) (internal quotation omitted).

In TRIA, Congress continued its historic respect of this vital Presidential authority by retaining the President's ability to protect foreign policy programs of reciprocity and other transactions authorized through regulation from frustration by the execution of crushing § 1605(a)(7) judgments.  In prior legislation, Congress had provided for execution against "any

---

[27]   *See* App. 9; Annual Reports for Congress on Assets in the United States of Terrorist Countries, *available at* http://www.treas.gov/offices/enforcement/ofac/.

property with respect to which financial transactions are prohibited *or regulated*" (emphasis supplied), *but* also provided that the President may waive the provision.[28]  Congress stated its acceptance of the President's unlimited TWEA authority over executions.  H. Rep. No. 106-939 (Conference Report), at 118 (2000).  The President exercised this waiver authority under the 1998 legislation and successor 2000 legislation.[29]

The President's waivers were as broad as the legislation – encompassing property that was either "prohibited" or "regulated" – contrary to Congress's strong admonition that he not exercise "blanket" waivers.  H. Rep. No. 106-939, at 118.  In TRIA, Congress and the President reached a compromise: Congress eliminated the President's waiver authority but, at the same time, drastically narrowed the scope of the legislation by eliminating "regulated" property, confining TRIA to "frozen" property and providing an express "license" exclusion for TWEA property.  In this way, Congress preserved the President's ability to protect foreign policy programs of reciprocity – such as the registration of trademarks – and other regulated transactions with Cuba.

## VI.   BECAUSE TRIA IS INAPPLICABLE, THE FOREIGN SOVEREIGN IMMUNITIES ACT PROHIBITS EXECUTION

Because TRIA is inapplicable, the demanded execution is barred by FSIA § 1609, which provides that the property of a foreign state, and of its agency or instrumentalities, is immune from execution unless one of the FSIA § 1610 exceptions applies.  FSIA § 1610(f)(1) provides

---

[28] Omnibus Consolidated and Emergency Supplemental Appropriations Act 1999, Pub. L. No. 105-277, Title I, § 117, 112 Stat. 2681 (1998); Victims Act, Pub. L. No. 106-386, § 2002, 114 Stat. 1543 (2000).

[29] Presidential Determination 99-1, 63 Fed. Reg. 59201 (Oct. 21 1998) (divesting President of control over executions against property subject to "prohibitions and regulations . . . would impede the ability of the President to conduct foreign policy"); Presidential Determination No. 2001-03, 65 Fed. Reg. 66483 (Oct. 28, 2000) (same).

an exception from FSIA § 1609 immunity for claims for which there is no immunity from suit under FSIA § 1605(a)(7) but, pursuant to FSIA § 1610(f)(3), the President has waived that provision. Presidential Determination, No.2001-03, 65 Fed. Reg. 66483 (Oct. 28, 2000).

## VII.   BECAUSE TRIA IS INAPPLICBLE, *BANCEC* PROHIBITS THE DEMANDED EXECUTION

The demanded execution is barred by *Bancec*'s "separate entity" rule, *First National City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611 (1983).  In seeking to overcome *Bancec*, the plaintiffs do not allege any of the *Bancec* exceptions but, rather, rely on TRIA.  Since TRIA is inapplicable, *Bancec* requires dismissal.

## VIII.   SETTLED PRINCIPLES OF TRADEMARK LAW BAR EXECUTION

### A.   Auction Would Be An Impermissible Transfer "in Gross"

It is "well-settled law that the transfer of a trademark … without the attendant good-will of the business which it represents is, in general, an invalid, 'in gross' transfer of rights." *Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc.,* 303 F.3d 1242, 1246 (11th Cir. 2002) (internal quotation omitted).  Plaintiff's mere recitation that the trademarks should be auctioned with "their respective accompanying goodwill," Impleader Motion, ¶ 45, is hopelessly inadequate.  "The mere fact that the assignment document recites that good will was transferred to the assignee does not control the validity of the assignment. …. courts will look to the reality of the transaction to see if 'good will' passed." 3 J. McCarthy, *McCarthy on Trademarks and Unfair Competition* ("J. McCarthy")  § 18:24 & n.1 (2009).  "[T]he test is whether the transaction is such that the assignee can go on in real continuity with the past." *Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc.,* 2001 WL 1944733, at *18 (S.D. Fla. Oct. 19, 2001), *aff'd,* 303 F.3d 1242 (11th Cir. 2002) (internal quotations omitted).  "[C]ourts historically have looked for a transfer of the assets embraced by the trademark to evidence the passage of

good will." *Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.,* 841 F. Supp. 1339, 1350 (E.D.N.Y. 1994)*; see* 3 J. McCarthy § 18:23.

Here, not only can there be no transfer of business assets in the U.S. connected to the marks in an auction of the registrations, because there are none, but there can be no other cognizable transfer of good will.  Rather than "real continuity with the past," auction of the registrations will result in a complete rupture of the trademarks from their good will.

As a leading, directly analogous case stated, "A trade name or mark is merely a symbol of goodwill;....  a trademark *cannot be sold or assigned apart from the goodwill it symbolizes* ... There are no rights in a trademark apart from the business with which the mark has been associated; they are inseparable." *Marshak v. Green*, 746 F.2d 927, 929 (2d Cir. 1984) (emphasis added); *see* 3 J. McCarthy § 18:2 ("Good will and its trademark symbol are as inseparable as Siamese Twins who cannot be separated without death to both."); *id.* nn.2-7 (citing cases).  In *Marshak*, the Court reversed an order authorizing the Marshal to attach and to auction the judgment debtor's "registered trademark" because there was no transfer of goodwill with the auction.

The Lanham Act has codified this doctrine:  "A registered mark or a mark for which an application to register has been filed shall be assignable *with the good will* of the business in which the mark is used, or with *that part of the good will* of the business connected with the use of and symbolized by the mark."  15 U.S.C. § 1060(a)(1) (emphasis added).

"By refusing to enforce assignments-in-gross, courts protect the public from being misled or confused about the source or nature of products, and insure that a mark continues to symbolize the identity and quality of a product."  *Int'l Cosmetics,* 2001 WL 1944733, at *18; *see Marshak*, 746 F.2d at 929-30 (transfer without goodwill "*would result in a fraud on the purchasing*

*public*") (emphasis added); 3 J. McCarthy § 18:3 ("break" in "the continuity of the thing symbolized by the assigned mark" may lead to fraud on the public).

Courts recognize three narrow exceptions to the rule, each requiring "real continuity with the past."  None is remotely applicable.  First, "[c]ourts have … upheld such assignments if there is a continuity of management," *Marshak*, 746 F.2d at 930; *Int'l Cosmetics,* 2001 WL 1944733, *19.  Second, courts have upheld an "assignment of United States trademark rights by a foreign manufacturer to its United States distributor," *International Cosmetics,* 303 F.3d at 1246 (internal quotation omitted).

Third, "a trademark may be validly transferred without a simultaneous transfer of any tangible assets as long as the recipient continues to produce goods *of the same quality and nature* previously associated with the mark."  *Defiance Button Mach. Co. v. C & C Metal Prod. Corp.*, 759 F.2d 1053, 1059-60 (2d Cir. 1985) (emphasis added); *see Marshak*, 746 U.S. at 930; *Int'l Cosmetics,* 2001 WL 1944733, at *18.  Impleader Defendants sell Cuban origin cigars and rum under the marks.  No one purporting to obtain the registrations by involuntary auction could produce *Cuban* cigars and rum, and thus could not produce goods of the *same quality and nature*, and would, by definition, commit a deception and fraud on consumers.

Cuban-origin cigars have a strong reputation and renown in the U.S., and false associations with Cuba and Cuban cigars constitutes consumer deception, as the TTAB has repeatedly held.  *See Corporacion Habanos, S.A. v. Anncas, Inc.*, 88 U.S.P.Q.2d 1785, 1792-93 (T.T.A.B. 2008) (HAVANA CLUB cigar mark geographically deceptive:  "desirability of cigars from Havana is well-known the world over. ... the goods/place association created by applicant's mark with Havana undoubtedly would be material in a customer's decision to purchase applicant's cigars"; expert testimony established that "the characteristics of a cigar are based on

... the kind (genetic type and purity) of the tobacco; the soil; the climate; and the agricultural and manufacturing processes. .... if any 'one of these factors is missing, then you don't get the quality that distinguishes the Habano [Cuban-origin cigar] in the world.'"); *Corporacion Habanos, S.A. v. Guantanamera Cigar Co.,* 86 U.S.P.Q.2d 1473, 1479 (T.T.A.B. 2008) (evidence "established Cuba's renown and reputation for high-quality cigars"; "Havana cigars[] have brought Cuba world fame") (internal quotations, citations omitted).

As to Cuban rum and Cubaexport's HAVANA CLUB registration, the Lanham Act, in a codification required by Article 23 of the Agreement on Trade-Related Aspects of Intellectual Property Rights ("TRIPS"), 33 I.L.M. 81 (1994),[30] recognizes as a matter of law the geographic significance of spirits, and imposes a *per se* bar to registration when the mark "[c]onsists of or comprises … a geographical indication which, when used on or in connection with wines or spirits, identifies a place other than the origin of the goods."  15 U.S.C. § 1052(a).  Further, in the hands of a person that cannot produce Cuban rum, the HAVANA CLUB mark would be geographically deceptive, working a fraud on consumers, as would the sale of Cubatabaco's LA CASA DEL HABANO ("the house of the Cuban cigar") cigar marks to someone who cannot produce Cuban Cuban cigars.  The TTAB has consistently refused registration to non-Cuban rum and cigar marks that include "Havana," as geographically deceptive, such as HAVANA CLUB for cigars and HAVANA SELECT, HAVANA CLIPPER and others for rum.  *See Anncas*, 88 U.S.P.Q.2d 1785; *In re Bacardi & Co., Ltd.,* 48 U.S.P.Q.2d 1031 (T.T.A.B. 1997); *In re Bacardi & Co. Ltd.,* 1997 T.T.A.B. Lexis 169 (T.T.A.B. 1997).

The only cases cited by Plaintiff, *Continental Cigar Corp. v. Edelman & Co, Inc..,* 397 So.2d 957 (Fl. Dist. Ct. App. 1981), and *Cuban Cigar Brands, N.V. v. Tabacalera Popular*

---

[30] Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994) (approving and implementing TRIPs)

*Cubana, Inc.,* 2008 WL 4279641 (S.D. Fla. Sept. 16, 2008), do not support auction of the registrations.  In *Continental Cigar,* involving Florida corporations, the state court did not order the sale of any trademarks or federal registration, and did not discuss either its power to do so, or the requirement that a mark be transferred with its good will.  Indeed, Continental Cigar continued to own the federal registration for six years after the court's decision.  *See* Reg. No. 1139286 (DOS GONZALEZ), *available at* www.uspto.gov.  The only issue the state court decided was who owned the trademark, the judgment debtor or third party Continental Cigar. The court retained jurisdiction to appoint a receiver for the insolvent *judgment debtor*, not just for the trademarks.  Transfer of the insolvent's assets to the judgment creditor would not separate the mark from its good will.

In *Cuban Cigar Brands*, the debtor did not address either the court's power to sell a federal registration or the requirement that a transfer of a trademark must be accompanied by a transfer of good will; the Magistrate Judge did not address that issue (nor did the plaintiff).  2008 WL 4279641, at *1.  With no further analysis, the Magistrate Judge merely cited to *Continental Cigar* for the proposition (never stated there) that "[u]nder Florida law, intangible assets, such as trademark rights, are amenable to execution under the statute."  *Id.*, at *2.

**B.  The Court Lacks the Power to Order the Seizure or Sale of the Registrations**

A further bar to the seizure and sale of the registrations is posed by 15 U.S.C. § 1119, which applies to "*any* action involving *a registered mark*" (emphasis added), and thus controls by its terms.  Section 1119 explicitly provides for and limits the power of the federal courts over the trademark registries established by Congress and administered by the Executive through the USPTO.[31]  No statute authorizes the federal courts to seize, or to order the seizure of, trademark

---

[31]  15 U.S.C.A. § 1119 provides:

registrations, to order the public sale of registrations, or to issue orders to the USPTO in connection therewith.  Plaintiff fails to identify any statutory authority for the requested relief, and fails to ask the Court to take any of the corrective actions authorized by section 1119.  Indeed, Plaintiff's pleading is wholly dependent upon the Register being correct.

The power of the federal courts over registrations pursuant to section 1119 is "*concurrent with, but not in excess of*, the [Board] and ... the district court is also limited by the language of the statutes controlling the Board." *Shakespeare Co., v. Silstar Corp. of America, Inc.*, 9 F.3d 1091, 1092 (4th Cir. 1993) (emphasis added); *Ditri v. Coldwell Banker Residential Affiliates, Inc.,* 954 F.2d 869, 874 (3rd Cir. 1992).  That concurrent power does not include authority to issue orders to the USPTO to transfer registered marks, or to order a Marshal to seize them.[32]

### C.    The Court has No Power to Sell Cubatabaco's Good Will in COHIBA

The Court also specifically lacks power to dispose of any interests that Cubatabaco has in COHIBA for three additional reasons.  First, Cubatabaco does not currently have any *property* rights in the United States in a COHIBA trademark for cigars or related accessories.  The Second Circuit so held in *Empresa Cubana del Tabaco v. Culbro Corp*., 399 F.3d 462 (2d Cir. 2005). *Id.* at 476 ("Cubatabaco's acquisition of the U.S. COHIBA mark through the famous marks doctrine is barred by the [CACR];" under the CACR, Cubatabaco may acquire trademark rights only

---

In any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action. Decrees and orders shall be certified by the court to the Director, who shall make appropriate entry upon the records of the Patent and Trademark Office, and shall be controlled thereby.

[32]  Courts also have no power under § 1119 to issue orders to the USPTO concerning applications. *See Citigroup Inc. v. City Holding Co.*, 2003 WL 282202, at *16 n.5 (S.D.N.Y. Feb. 10, 2003); 5 J. McCarthy § 30:113.50 (courts "have no jurisdiction or power to cancel" applications); *Whitney Info. Network, Inc. v. Gagnon*, 353 F. Supp. 2d 1208, 1211 (M.D. Fla. 2005).

through registration, which is blocked by General Cigar's prior registration). In supplementary proceedings, a court can only order execution upon "property," Fla. Stat. § 56.29(5), and here, there is no COHIBA property to execute upon.

Second, Cubatabaco does have a protectible *non-property* interest in its *foreign mark's good will* in the U.S., under New York law of unfair competition.  *See Empresa Cubana del Tabaco v. Culbro Corp.*, 587 F. Supp. 2d 622, 634 (S.D.N.Y. 2008).  Yet, in addition to the legal barrier, this Court has no power to sell that *foreign* mark's U.S. *good will*, and any buyer claiming that good will would be perpetrating a deliberate fraud.  Nor could a forced sale strip Cubatabaco of the foreign mark's good will in the U.S., any more than General Cigar's ownership of the COHIBA mark in the U.S. allowed it to exploit that good will, *Id.* at 631-34.

Third, the COHIBA application is based on section 44(e), which requires that the "applicant shall submit … *the registration in the country of origin of the applicant*...." 15 U.S.C. § 1126(e) (emphasis added).  Any person who purports to purchase the COHIBA application will not have the Cuban registration – "the country of origin of the applicant," and so prosecution of the application must either fail or result in a court-sanctioned fraud on the USPTO.  This point applies with equal force to Cubatabaco's HABANOS certification mark application, which also is based on section 44(e) and a Cuban registration.

> **D.     Execution Upon the Certification Marks Would Constitute a Fraud on Consumers and Would Violate International Agreements**

In addition to all the above-stated reasons, any forced sale of the Republic of Cuba's Government Warranty Seal certification mark and Cubatabaco's application for the certification mark HABANOS would necessarily constitute a fraud on consumers and the USPTO.  The Government Warranty Seal certifies "the origin of the tobacco products with which the mark is used," and the HABANOS mark certifies "the exclusive character of pure Cuban cigars or

tobacco produced in Cuba, 'Cuba' meaning the entire national territory of the Republic of Cuba." App. 10 and 11. Not only is no non-Cuban person in a position to certify the Cuban origin of cigars or tobacco, but the notion that a private party can act as if it were the Republic of Cuba and provide its Warranty and Guaranty of the authenticity of the Cuban origin of tobacco products is absurd. Any attempt either to use the certification marks or to pursue the application would require false statements and would constitute deliberate frauds on both consumers and the PTO (and a failure to use the marks or pursue the application would be an abandonment); a forced sale would unavoidably implicate the Court in that fraud.

The U.S. asserts that it discharges its international obligations to protect foreign "geographical indications," such as the Government Warranty Seal and HABANOS certification marks, as required by Article 22 of TRIPS and the General Inter-American Convention for Trade Mark and Commercial Protection (the "IAC"), Arts. 23-28, 46 Stat. 2907 (1930), by, *inter alia*, permitting foreign parties to register certification marks pursuant to 15 U.S.C § 1054. *See* USPTO, *Geographical Indication Protection in the United States,* available at www.uspto.gov. The U.S. would clearly violate TRIPs and the IAC both by allowing the forced sale of ownership of the certification marks to a non-Cuban party, who cannot truthfully certify Cuban origin, and conversely, by preventing Cuban entities from protecting geographical indications.

Further, specifically as to the Government Warranty Seal: IAC, Art. 4 requires members to "cancel the registration and to prohibit the use, without authorization by competent authority, of marks which include ... official labels, certificates or *guarantees* ...." (emphasis added). Article 6*ter* of The Paris Convention for the Protection of Industrial Property, 21 U.S.T. 1583, T.I.A.S. No. 6923 (1973), requires members "to refuse or to invalidate the registration, and to prohibit ... the use, without authorization by the competent authorities, either as trademarks or as

elements of trademarks, ... official signs and *hallmarks indicating control and warranty* adopted by them ....  (Emphasis added).  Article 2 of TRIPs incorporates Article *6ter*.  It is difficult to imagine a more blatant violation of these international obligations than for the United States to allow a private party to affix to tobacco products a seal stating "*REPUBLICA DE CUBA CUBAN GOVERNMENT'S WARRANTY FOR CIGARS EXPORTED FROM HAVANA.*"

## IX.   EXECUTION WOULD VIOLATE THE UNITED STATES' INTERNATIONAL OBLIGATIONS

In addition to the foregoing, the United States would also be in violation of its international obligations if its courts enforced § 1605(a)(7) judgments, which can be obtained only against a handful of countries, by ordering execution upon trademark registrations.  Further, TRIA discriminates against agencies and instrumentalities from the same handful of countries, by denying them the protection of the *Bancec* "separate entity" doctrine, and more generally, the alter ego doctrine.  The Paris Convention, Art. 2; the IAC, Art. 1 and TRIPs, Arts. 2-4, commit the United States to provide the same protections to the nationals of one country that it provides to the nationals of other countries ("most-favored-nation treatment") and to its own nationals ("national treatment").

Nothing in TRIA compels its application to the registrations, in violation of the U.S.'s international obligations in these and the other ways noted above, Point VIII.  Settled law instructs the Court to avoid such an interpretation where, as here, it is possible to do so.  Statutes may not be interpreted to violate U.S. treaties and international agreements "unless such purpose on the part of Congress has been clearly expressed."  *Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 252 (1984) (internal quotation omitted). General statutory measures, such as TRIA, are not sufficient, because their violation of international obligations may be an "unintended consequence."  *See, e.g., id.* at 252;  *Weinberger v. Rossi*, 456 U.S. 25, 32, 35

(1982).  *See also Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 178 n.35 (1993).

## CONCLUSION

For the foregoing reasons, Cubatabaco and Cubaexport's motion to dismiss the Impleader

Action should be granted.

Respectfully submitted, this 2nd day of October, 2009.

On the Brief:                          KURZBAN KURZBAN WEINGER & TETZELI, P.A.
                                       2650 S.W. 27th Avenue, 2d Floor
Michael Krinsky                        Miami, Florida 33133
David Goldstein                        Telephone:  (305) 444-0060
Jules Lobel                            Facsimile:  (305) 444-3503
Lindsey Frank

                                       By: /s/  Ira J. Kurzban
                                       IRA J. KURZBAN, ESQ.
                                       Florida Bar No.:  225517
                                       Email:  ira@kkwtlaw.com

                                       By:  /s/  Geoffrey A. Hoffman
                                       GEOFFREY A. HOFFMAN
                                       Florida Bar No.:  59972
                                       Email gahoffman@kkwtlaw.com

                                       *Attorneys for Impleader Defendants Empresa Cubana del
                                       Tabaco, d/b/a Cubatabaco ("Cubatabaco") and Empresa
                                       Cubana Exportadora de Alimentos y Productos Varios,
                                       d/b/a Cubaexport ("Cubaexport")*

                                       s/Michael Krinsky, Esq.
                                       Michael Krinsky, Esq.
                                       David B. Goldstein, Esq.
                                       Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C.
                                       *Co-Counsel for Impleader Defendants Empresa Cubana
                                       del Tabaco, d/b/a Cubatabaco and Empresa  Cubana
                                       Exportadora de Alimentos y Productos Varios, d/b/a
                                       Cubaexport*
                                       111 Broadway, Room 1102
                                       New York, New York 10006
                                       Telephone:      (212) 254-1111
                                       Fax:            (212) 674-4614
                                       E-mail:         mkrinsky@rbskl.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing Impleader

Defendants Empresa Cubana del Tabaco and Empresa Cubana Exportadora de Alimentos y

Productos Varios' Memorandum of Law in Support of Motion to Dismiss is being served upon

Roberto Martinez, Esq., Karen Stewart, Esq. and Alfonso Perez, Esq., attorneys for plaintiffs via

CM/ECF; is being served by DHL/World Wide Express upon the persons or entities in Havana,

Cuba at the addresses listed on the Service List; and is being served by United States first-class

mail on the remaining persons or entities listed below on this 2nd day of October, 2009.

By: /s/  Ira J. Kurzban
IRA J. KURZBAN, ESQ.


### SERVICE LIST


Roberto Martinez, Esq.
Colson Hicks Eidson
255 Aragon Avenue
Coral Gables, FL 33134
Tel. No. 305 476-7400
Fac. No. 305 476-7444
Attorney for Plaintiffs

Alfonso Perez, Esq.
Rasco Reininger Perez Esquenazi & Vigil P.A.
283 Catalonia Avenue
Coral Gables, FL 33134
Tel. No. 305 476-7100
Fac. No. 305 476-7102
Attorney for Plaintiffs


The Republic of Cuba
Bruno Rodriguez Parrilla
El Ministerio de Relaciones Exteriores
Calzada 360, Vedado
Havana, Cuba

Fidel Castro Ruz
Aranguren entre Carlos Manuel de Cespedes y
Avenida de la Independencia
Plaza de la Revolucion
Havana, Cuba

Raul Castro Ruz
Avenida de la independencia, esquina 20 de mayo,
Plaza de la Revolucion
Havana, Cuba

Cuban Revolutionary Armed Forces
(Las Fuerzas Armadas Revolucionarias Cubanas)
Avenida de la Independencia, esquina 20 de mayo
Plaza de la Revolucion
Havana, Cuba

The Ministry of the Interior
(El Ministerio del Interior)
Aranguren entre Carlos Manuel de Cespedes y
Avenida de la Independencia
Plaza de la Revolucion
Havana, Cuba

Empresa De Telecomunicaciones De Cuba S.A. a/k/a ETECSA
Ave 3ra el 76 y 78
Miramar Playa,
Playa, Havana
   And
Ave De Belgica 610
Havana Vieja

The Honorable John J. Doll
Acting Under Secretary of Commerce for Intellectual Property and
Acting Director of the U.S. Patent and Trademark Office
Madison Building West
600 Dulany Street
Suite 10 D 44
Alexandria, VA 22314

Jacqueline Levasseur Patt, Esq
Venable Law Firm
P.O. Box 34385
Washington, D.C. 20045-9998
For Empresa De Telecomunicaciones De Cuba S.A. a/k/a ETECSA

Ira J. Kurzban, Esq.
Geoffrey A. Hoffman, Esq.
Kurzban Kurzban Weinger & Tetzeli, P.A.
2650 S.W. 27th Avenue, 2d Floor
Miami, Florida 33133
-and-
Michael R. Krinsky, Esq.
David B. Goldstein, Esq.
Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C.
111 Broadway, Eleventh Floor
New York, NY 10006
Attorneys for Empresa Cubana del Tabaco, d/b/a Cubatabaco and
Empresa Cubana Exportadora de Alimentos y Productos Varios d/b/a Cubaexport